UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BRENDA PERRYMAN,                                    CIVIL NO. 12-247 (MJD/JSM)

      Plaintiff,

v.                                                 REPORT AND RECOMMENDATION

CAROLYN COLVIN,[1]
Acting Commissioner of Social Security,

      Defendant.

JANIE S. MAYERON, United States Magistrate Judge.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's Motion for Summary Judgment [Docket No. 20]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment be **DENIED** and that defendant's Motion for Summary Judgment be **GRANTED**.

I.      **PROCEDURAL BACKGROUND**

On January 7, 2010, plaintiff Brenda Perryman protectively filed for disability insurance benefits ("DIB"), alleging that she has been disabled since October 11, 2009, due to mental disorder; degenerative disc disease, bipolar disorder, anxiety;

---

[1]      Perryman sued Michael J. Astrue, who was then the Commissioner of Social Security. Complaint [Docket No. 1]. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin has been substituted for Michael J. Astrue.

fibromyalgia, learning disability, and depression. Tr. 63, 171, 176-77. Perryman's applications were denied initially and upon reconsideration. Tr. 63-72. At Perryman's request, an administrative hearing was held on August 24, 2011, before Administrative Law ("ALJ") Judge Virginia Kuhn. Tr. 12, 82-83. Perryman was represented by an attorney during the hearing. Tr. 12. Testimony was taken at the hearing from Perryman, and a vocational expert. Tr. 32. The ALJ issued a decision on September 16, 2011, finding that Perryman was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 12-25. Perryman filed a request for review of the ALJ's decision with the Appeals Council, the Appeals Council denied Perryman's request for review and upheld the ALJ's decision denying disability insurance benefits to Perryman (Tr. 1-6), making the ALJ's findings the final decision of defendant. See 42 U.S.C. § 405(g).

Perryman has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). [Docket No. 1]. The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's Motion for Summary Judgment [Docket No. 20].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

### A. Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

### B. Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-

404.982, 416.1467-1482. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C. Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of plaintiff's impairments.

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.2d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.30 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III. DECISION UNDER REVIEW

### A. The ALJ's Findings of Fact

The ALJ concluded that Perryman was not entitled to disability insurance benefits under sections 216(i) and 223(d) of the Social Security Act, or supplemental security income under section 1614(a)(3)(A) of the Social Security Act. Tr. 25.

The ALJ made the following determinations under the five-step procedure. At step one, the ALJ found that Perryman had not engaged in substantial gainful activity since October 11, 2009. Tr. 14. The ALJ also noted that Perryman applied for and received unemployment compensation in the first quarter of 2010, fourth quarter of 2010 and the first quarter of 2011, which required to her to represent that she was ready and able to work and was not consistent with the allegation of disability during the same period. Id.

At the second step, the ALJ found that Perryman had severe impairments of a degenerative disc disease of the spine, cognitive disorder not otherwise specified/traumatic brain injury, and borderline intellectual functioning. Id. The ALJ also noted that Perryman had suffered from seizures in the past, but that they presently

inactive and that Perryman had not required medication for some time. Tr. 15. Further, ALJ found that Perryman's depression was not a severe limitation based on the opinions by state agency psychological consultants who found that the condition was under control; the fact that her attorney did not argue that she was disabled based on depression; the record showed no limitations secondary to depression; her depression was listed in remission with the use of medications; and Dr. Julie McGinnis-Borg, the licensed psychologist who performed a consultative examination of Perryman, did not diagnose Perryman with depression. Id.

At the third step of the evaluation, the ALJ determined that Perryman did not have impairment or combination of impairments that met or equaled the relevant criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. With regard to the severity of Perryman's mental impairments, the ALJ concluded that her impairments did not meet or medically equal the criteria listing of 12.02 because her mental impairments did not result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation. Id.

With regard to activities of daily living, the ALJ concluded that Perryman had a moderate restriction. Tr. 16. In making this finding, the ALJ relied on Perryman's testimony that she goes to the grocery store with her husband, cooks, gardens and she and her husband wash the dishes together. Id. In addition, the ALJ relied on Perryman's function report in which she claimed her ability to care for herself was limited by her physical ailments, while at the same time stating she could prepare meals, shop in stores, count change, and use bank accounts. Id. (citing Tr. 200-09).

The ALJ also noted that Perryman's assertion that she was limited in her ability to care for herself was contradicted by her May 2010 report to the SSA consultative psychologist that she is fully independent in her ability to groom herself and take care of her hygiene, and that she shared the household duties with a foreign exchange student living in her home. Id. (citing Tr. 376-82). Additionally, the ALJ relied on the third party function report prepared by Perryman's husband in which he stated that he and Perryman took care of their two cats. Id. (citing Tr. 214-21).

The ALJ concluded that Perryman had moderate difficulties with social functioning. Id. The ALJ noted that Perryman reported that she has not always gotten along with her family and she does not have many friends. Id. (citing Tr. 200-09). In addition, the ALJ relied on Perryman's representations that she communicates often with her children on the phone, Facebook and Skype; she tries to get along with her supervisors; and had never been let go from her job due to difficulties with interacting with others. Id. The ALJ also based her opinion on Perryman's husband's representation that Perryman got along with authority figures "very well" and visited with friends and neighbors. Id. (citing Tr. 214-21, 242-50).

As for the area of concentration, persistence or pace, the ALJ found that Perryman had moderate difficulties in this area. Id. In reaching this conclusion, the ALJ relied on Perryman's assertion in her function report that she had difficulty with concentration, understanding and her memory; her statement that she could drive a car; the fact that she could use a computer to talk to her daughter through Skype, to play games like Bingo and to shop; she watched television; she reported that she does not need reminders to perform personal cares; she indicated that she needed clarifying questions in order to follow instructions; a field officer interviewer reported that Perry

was slow thinker, but noted no difficulties in understanding or coherency; and her husband reported that she could follow instructions "fairly well and watched movies. Id. (citing Tr. 171-74, 200-09, 214-21, 242-50). Additionally, the ALJ relied on the SSA consultative psychological examination performed in May, 2010, during which Perryman reported no difficulty with concentration and getting distracted, but eventually persisting to complete a task; and her mental status exam, which showed good eye contact, normal psychomotor activity, the ability to perform basic mathematical operations, intact judgment, an impaired abstract ability, and a full scale IQ of 71, which was assessed as a borderline cognitive ability. Id. (citing Tr. 376-82). The ALJ also relied on the state agency consultant's opinion in finding that Perryman had a moderate limitation with concentration, persistence or pace. Tr. 17 (citing 389-402).

The ALJ noted no evidence of episodes of decompensation. Tr. 17.

ALJ also addressed at step three Perryman's counsel's assertion that Listing 12.05C was met based on a verbal IQ score of 68 and a significant back injury. Id.

Listing 12.05 states in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

The introductory paragraph requires "demonstrating that the claimant suffered 'deficits in adaptive functioning' and that those deficits 'initially manifest during the developmental period [before age 22].'" Cheatum v. Astrue, 388 F. App'x 574, 576 (8th Cir. 2010) 388 F. App'x at 576 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05) (emphasis added).

The ALJ concluded that the core definition of mental retardation requires deficits in adaptive functioning that are commensurate with an IQ score and that Perryman had not met this definition. Tr. 17. In reaching this conclusion, the ALJ relied on the evidence in the record that despite a traumatic brain injury at age 3, Perryman worked consecutively for years in semi-skilled position as a certified nursing assistant; she lived independently with her husband; she could operate a motor vehicle; she successfully completed a certified nursing assistant course, although she testified that the tests were read to her; and she played games on the computer and used Skype to talk to her daughter. Id. According to the ALJ, this evidence did not support deficits in adaptive functioning needed for a finding of mental retardation under Listing 12.05C. Id. The ALJ found it significant that the SSA consultative psychological evaluator did not diagnose or assess mental retardation based on the IQ testing. Id.

At the fourth step, the ALJ concluded that the Perryman had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b), except no climbing of ladders, ropes or scaffolds; occasional stooping, crouching, kneeling, and balancing; no crawling; clearly communicated either orally or in written format routine, repetitive, 3-4 step tasks with brief and superficial contact with coworkers, the public and supervisors; no reaching overhead and above shoulder level; and occasional bending to positions below the waist. Tr. 18. Based on this RFC, the

ALJ determined that Perryman was unable to perform her past relevant work as a certified nursing assistant. Tr. 23.

At the fifth step, the ALJ found that there were unskilled light work jobs that existed in significant numbers in the national economy that the Perryman could perform, such as inspection, food packager, and assembly. Tr. 24.

## IV. THE RECORD[2]

### A. Background

Perryman was 47 years old at the time of the hearing and the ALJ's decision. Tr. 25, 36. Her past employment was as a certified nursing assistant from 2001 through October 11, 2009. Tr. 190.

### B. Functional Reports by Perryman and her Husband

On January 26, 2010, Perryman and her husband filled out reports regarding her ability to function. Tr. 200-09, 214-21. Perryman reported that her typical day involved getting up, making the bed, showering, eating breakfast and lunch, talking with her kids on the phone or on the computer, cleaning and doing the laundry, helping with supper and clean-up, watching television, going out for a drive, visiting with her husband and a

---

[2] As set out in Section V below, the only argument presented by Perryman in her challenge to the ALJ's decision was that the ALJ improperly that she did not meet Listing 12.05C for mental retardation. The Commissioner conceded that Perryman's verbal IQ score of 68 and physical limitations satisfied the severity components – i.e. the third and fourth elements of Listing 12.05C. Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem."), p. 13. Therefore, the only issue presented by this suit is whether Perryman meets the diagnostic criteria for mental retardation – that she exhibits "deficits in adaptive functioning initially manifested [before age 22]." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Accordingly, this Court only summarizes the evidence in the record bearing on this issue. See Craig v. Apfel, 212 F.3d 433, 437 (8th Cir. 2000); see also Yeazel v. Apfel, 148 F.3d 910, 911-12 (8th Cir.1998) (citing Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994) (finding failure to raise an issue before this Court results in waiver of that argument)).

foreign exchange student living with her and going to bed. Tr. 200. Perryman indicated that she took care of her cats. Tr. 200-01. Perryman also reported that she needed reminders to take her medication and that were days that she forgot to take them. Tr. 202. Perryman indicated that she was able to prepare her own meals, including sandwiches, salads, casseroles; she baked brownies and cakes; and she prepared meals daily for herself and on most nights, supper for herself and her husband. Id. Perryman indicated that there were times when she could not make meals because she became agitated when she could not figure out what to make. Id. She stated that she performed house work, but no yard work due to the fact it was too hard on her knees and back. Tr. 202-03. According to Perryman, she went outside her home a few times every day; drove her car if the weather was good; went shopping once a month for a half hour with her husband; was able to count change and handle a savings and checking account, but not pay bills, as she had always struggled with money due to a learning disability; she watched up to eight hours of television a day; she spent two hours on the computer; she had difficulty understanding news programs; she often spoke with her children over the telephone and computer; she needed to be reminded to go places with the help of writing notes to herself and her husband's reminders; she had not always gotten along with her family (becoming easily agitated); she did not have many friends and kept to herself; and she had problems understanding jokes and regular conversations. Tr. 203-05, 207. She also stated that she needed to ask many questions in order to understand spoken instructions; she got along well with authority figures and was able to work things out if they could not understand her due to her leaning disability; she had difficulty talking due to an expressive language disorder; she could remember events that occurred a long time ago, but had difficulty focusing on the

recent past; she had difficulty completing tasks because she could not remember what she had done or where she had left off on a task; her mind wandered off; she had difficulty understanding anything she would need to read or comprehending the news; she could not handle stress well; and she became frustrated with changes in her routine.  Tr. 205-08.

Perryman's husband reported that Perryman cared for two cats; she often needed reminders to take medicine at night; she prepared her own meals; she was able to clean the house and do laundry; she went outside daily; she was able to drive a car if the weather was good; she went shopping 1-2 times per month; she was able to count change and handle a savings and checking account, but not pay bills and had trouble balancing a checkbook; she watched television for five hours a day, spent two hours on the computer and spent 1-2 hours a day observing wildlife; she was confused by news shows and asked lot of questions; she needed reminders if she was doing more than one thing, going to more than one place, and needed to be accompanied to places if she did not understand the situation; she had trouble with her family and only had two friends; and she stayed at home more and did not socialize because of her back pain. Tr. 215-19.  Perryman's husband also indicated that Perryman could follow written instructions "fairly well," if they were set forth step-by-step, but that she could not follow spoken instruction because she became confused quickly.  Tr. 219.  He also stated that Perryman got along "very well" with authority figures, did not handle stress very well because she became emotional and agitated, became frustrated with changes in her routine, and had a fear of being alone.  Tr. 220.

On May 2, 2010, Perryman and her husband prepared another set of reports regarding her ability to function.  Tr. 234-41, 242-249.  Perryman's second report was

similar to her previous report as it related to non-physical limitations to her daily activities. She reported taking care of her husband and a foreign exchange student in terms of cooking support and cleaning as best as her physical limitations allowed her, as well as taking care of two cats. Tr. 235. She again stated that she needed reminders to take her medications; prepared meals daily; cleaned the house and did laundry; she went outside daily for 2-3 hours a day; drove a car; went shopping, sometimes alone; was able to count small change and get money orders, but had trouble with her checkbook and could not pay bills, which stemmed from a problem with math since childhood; she watched television and spent time on the computer every day; she talked with her kids on a daily basis; she did not go anywhere due to anxiety issues; she was diagnosed with a short-term memory disorder; she did not go anywhere unless her husband was with her; people made fun of how she said things due to an expressive language disorder, so she just kept to herself; she could pay attention for 30 minutes to an hour; she had to ask questions regarding written or oral instructions before she could understand them; she got along "good" with authority figures, although she had to explain herself a lot; she had never been laid off due to problems with getting along with others; she tried to handle stress; she did not handle changes in routine well; and did not like being alone. Tr. 234-41.

Perryman's husband's second report was also substantially similar to his initial report as it related to non-physical limitations on Perryman's daily activities. He noted that on a daily basis, Perryman visited with neighbors and friends and spoke on the phone to her family. Tr. 246. While Perryman did not go alone to places, it was because she needed help walking. Id. He also noted that she was unable to express herself fully, which people interpreted as her being rude; she could pay attention up to

two hours at a time; she sometimes needed to have written instructions explained; she had trouble at times following oral instructions without repetition; she handled authority figures very well; she had trouble handling stress at times; and did not like change.  Tr. 247-48.

C.    **Medical Records**

1.    **Early Childhood through the Age of 22**

In July of 1968, Perryman, who was almost four at the time, was hit by a truck. Tr. 434, 439.  Perryman was unconscious and in a coma for a period of time as a result of this accident.  Tr. 445, 1209.  Perryman was diagnosed with possible intracranial hemorrhage; a skull fracture (confirmed by x-ray); a laceration to right forearm; a cerebral concussion and multiple contusions and abrasions, and doctors wanted to rule out possible abdominal and renal injuries.  Tr. 434-35, 437, 439, 444, 1209, 1211. Perryman underwent surgery to evacuate a hemorrhage from the left side of her head. Tr. 527.  The brain appeared to be quite necrotic and hemorrhagic.  Tr. 1207.  An electroencephalogram obtained on July 19, 1968, was diffusely abnormal with suppression of activity in the left temporal area and diffuse slowing of background activity.  Id.

On January 20, 1974, Perryman (age 9) presented for a neurological examination by Dr. Joseph Cullen, M.D.  Tr. 1205.  Perryman presented with signs of hyperactivity, learning problems in school, periodic bouts of depression and alteration of behavior.  Id.  Perryman's full scale IQ had dropped from 100 in 1971 to 83 in 1974.  Id. Her abnormality was characterized as being diffuse with no focal learning problem, which represented an organic brain syndrome, as well as a behavior disorder of childhood, with social maladjustment.  Id.  The examination of Perryman showed no

hyperactivity, she responded appropriately to simple commands, and her speech was normal. Tr. 1206. While her testing showed normal neurological function, her psychometric evaluation showed evidence of diffuse organic brain damage. Id. A review of the EEG suggested that epileptiform activity might be causing some unnoticed seizure phenomenon that was interfering with her learning process and contributing to her behavioral problems. Tr. 1204, 1206. As a result, Perryman was placed on anticonvulsant medications. Tr. 1206. Her diagnosis was old post-traumatic extradural hematoma with post-traumatic convulsive disorder and secondary learning and behavioral deterioration. Tr. 1204.

At age ten, Perryman developed a seizure disorder, petite mal variety, and had been on anti-seizure medications since that time. Tr. 527.

On August 10, 1980 (age 16), Perryman fell down a flight of six stairs and when she got up she fell down again striking her head against the concrete and losing consciousness for an undetermined amount of time. Tr. 527. During her examination, Perryman was sluggish in responding to questions and was hesitant with her answers. Tr. 525, 528. Perryman was diagnosed with a mild concussion and head trauma. Tr. 528.

On November 14, 1980, Perryman attempted suicide, and was hospitalized at St. Joseph's Hospital, Minot, North Dakota, until December 23, 1980. Tr. 487, 515, 519. She had taken erythromycin, Mebral (anti-seizure medication) and aspirin in minimal quantities, leading one doctor to characterize her actions a "suicidal gesture." Tr. 557. According to Perryman's mother, Perryman had been at odds with her parents over her dating a 20-year-old man in the air force. Tr. 545. Perryman had recently told her parents that she believed she was pregnant and was telling her teachers that she was

pregnant and getting married.  Id.  Perryman got into multiple fights with her parents over the relationship.  Tr. 546.  Perryman's mother stated that they had gotten along well in the past and that Perryman had depended on her mother, but that Perryman was at present very angry at her.  Id.  Perryman had a variety of contacts with the school district mental health center and the area social service center as a result of family altercations.  Tr. 557.

As to her past, Perryman's mother reported that Perryman was normal until she was hit by a pickup truck right before her fourth birthday, which necessitated surgery on her head.  Tr. 546.  Perryman's mother was told that Perryman would have problems learning.  Id.  Perryman was in kindergarten for a couple of years due to adjustment problems and had difficulty through elementary school, as the school was not used to dealing with a learning disabled child.  Id.  Things got better in junior high, as they made some allowances for her learning disability.  Id.  However, she was considered by many of the children to be "retarded" and was rejected, thereby causing to quit trying with other kids.  Id.  In the eighth grade, Perryman was sexually assaulted by a group of boys who were surprised that she filed any charges considering she was "retarded" and that "retarded people didn't have any feelings."  Id.  The social worker reported that Perryman was not "retarded" and was of at least average ability.  Id.  Perryman had made the honor roll the year earlier, although she had been placed in classes that were not as academic; she was given permission to use a tape recorder in classes in order to tape lectures; she was told ahead of time if there was going to be a pop quiz; and in the present year she had gotten mostly D's due to a lack of motivation, although Perryman reported getting good grades in every subject except history.  Tr. 546, 1190.

Perryman recognized that she had a temper, noting at times that she would go "berserk," and the record showed that she had problems getting along with her family. Tr. 483, 1190. Perryman indicated that killing herself was on her mind because she was angry with her parents and their choice was letting her have what she wanted as it relates to her boyfriend or letting her go to the cemetery. Tr. 1190. During her hospitalization, it was noted that she socialized well and interacted well in social activities. Tr. 590. Her psychiatric diagnosis was relationship problems, dissociative reaction, oppositional disorder, learning disability and epilepsy. Tr. 519, 520.

On January 12, 1981, Perryman was admitted into St. Joseph's Hospital for attempting to slit her wrists. Tr. 1168. It was reported that Perryman was having a great deal of problems with getting along her parents and that school had been difficult for her. Id. Kids had been teasing her, but this had improved. Id. On admission, the mental status examination indicated evidence of depression, but no other signs or symptoms of a thought disorder. Id. The main problems for Perryman centered on relationships. Id. Specifically, there was a power struggle between Perryman and her parents. Tr. 1170. Perryman appeared to have a diminution of her mood, her flow of thought was spontaneous and showed no evidence of a thought disorder, she was well orientated and her memory was grossly intact. While Perryman did have some type of learning disability, her IQ was at least on an average level. Id. The diagnosis for Perryman was:

| | |
|---|---|
| Axis I: | Neurotic depression<br>Parent-child problems.<br>Oppositional disorder.<br>Relationship problems. |
| Axis II: | Other learning disability. |
| Axis III: | Epilepsy. |

|        |                                                                 |
|--------|-----------------------------------------------------------------|
| Axis IV: | Severe with continued conflict with mother. She is also experiencing stress at school because the children were teasing her about her recent hospitalization in the psychiatric ward. |
| Axis V: | Level of adaptive functioning past year is fair to good. |

Tr. 1171-72.

On February 9, 1982, Perryman (age 18) was seen for her diagnosis of post-traumatic seizures which were at that time uncontrolled, despite medication. Tr. 1203. Perryman's speech was normal upon examination. Id. Perryman was placed on a different medication in order to treat her seizures. Id. Perryman tolerated the new medication well. Tr. 1202. In an April 15, 1983 progress note by Dr. Cullen, it was reported that Perryman (age 18) was seizure free with her medication regimen. Tr. 1201. The note also included that Perryman had difficulties trying to pass her written driver's test because of her learning disability, but that she showed Dr. Cullen her report card in which she got almost straight A's. Id.

In September 1986, when Perryman was 22, she was admitted to United States Air Force Regional Hospital, Minot, North Dakota, due to possible suicide attempts involving overdosing. Tr. 651-52, 656. The stressors identified included a lack of a job, caring for her child with possible SIDS issues, marital stressors and her relationship with her neighbor by whom she felt abused. Tr. 651-52, 1156. Perryman noted that she had a problematic relationship with her parents in the past, but denied having any problem with them at the time of her admission. Tr. 654. She reported working as a teaching assistant several years earlier, but quit following a miscarriage. Tr. 653. She also reported having a learning disability problem that prevented her from obtaining

employment.  Id.  Perryman stated that her past recreational interests included gymnastics, ice skating and playing the piano, and that her present interests included playing the organ and being a swimming instructor.  Tr. 1159.  She also indicated that she spent leisure time with family and friends.  Id.  Perryman identified her main problem was seizures.  Tr. 670.

Perryman was administered the Stanford-Binet Intelligence Scale test in which she was assessed with a full scale IQ of 87 with a verbal reasoning IQ of 42, abstract visual reasoning IQ of 95, quantitative reasoning at 79 and a short term memory IQ of 108.  Tr. 651, 674.  Perryman's full scale IQ placed her at the low-average of intelligence.  Tr. 674.  The verbal IQ suggested difficulties for Perryman in the verbal area. Tr. 675.  Perryman was also administered the Turia Nebraska Nueropsychological battery of tests, which showed that she had difficulties with speech, especially with receptive speech, expressive speech, writing, reading and arithmetic.  Id.  The Minnesota Multiphasic Personality Inventory test results were consistent with individuals that are somewhat self-centered and infantile with their expectation of others, demand a great deal of attention, and may become hostile or resentful when their demands are not met.  Id.

Perryman's first husband, Dave Matishek, reported to a social worker on September 29, 1986, that Perryman suffered from a learning disability and seizures, her self-esteem was never good, and she would become irritated and bitter whenever she was rejected.  Tr. 659. Perryman's discharge diagnosis was:

Axis I.        Dysthymic Disorder.

Axis II.       Personality disorder, unspecified.

Axis III.      Seizure disorder.

Axis IV.     Severity of psychosocial stressor four, moderate.

Axis V.      Highest level of adaptive functioning past year four, fair.

Tr. 652.

## 2.     Medical Records from October 2009 and Thereafter

The medical records from October 2009[3] (the month Perryman claims she became disabled for the purposes of disability benefits) and after focused almost exclusively on hip strain, leg pain and degenerative disc disease Perryman had developed as a result of working as a certified nursing assistant.  See, e.g., Tr. 1266-72, 1307-08, 1313, 1362, 1369-70, 1375, 1377, 1379, 1383, 1394-95, 1401-03, 1409-11. During this time period, Perryman's medical providers, Dr. Manuel Pinto and physician assistant Michael McCarthy, found at times that Perryman was unable to work as a result of physical ailments, as opposed to some mental or intellectual limitation.  See,

---

[3]     The Court has not set forth the medical record with specificity after 1986 through September 2009, as it did not bear on whether Perryman had deficits in adaptive functioning as of the onset date of her disability.  For example, the record after she turned 22 through the onset date of disability in October, 2009, showed that that Perryman suffered from depression and anxiety–in many cases flowing from interpersonal conflicts with her mother, first husband and other boyfriends–which was brought under control with medications and did not make it difficult for her to meet home, work or societal obligations (see, e.g., Tr. 303 670, 814-38, 890, 898-908, 927, 971-977, 984, 997, 1024, 1095-1104, 1233-38); bipolar and intermittent explosive disorder that was brought under control with a conservative medication regimen (see, e.g., Tr. 1213-43, 1250-65); seizures which were brought under control with medications (see, e.g., Tr. 672, 848); nasal problems (see, e.g., Tr. 715, 1317, 1319-20); knee problems (see, e.g., Tr. 726-34, 739-41, 744, 746, 1086, 1345, 1348); pelvic pain (see, e.g., Tr. 786, 1038); a pulled groin muscle (Tr. 1337); menopausal symptoms (see, e.g., Tr. 1339); and back pain (see, e.g., Tr. 888-89).  Moreover, the records are not relevant to Perryman's challenge to the ALJ's decision, as she has not asserted that the ALJ erred in concluding that her depression or seizure disorder was a not a severe impairment. Tr. 15, 280-81.  Likewise, Perryman has neither relied on nor pointed to any pre-October 2009 records (other than that which occurred prior to when she turned 22), to support the assertion that she suffered from deficits in adaptive function during the alleged period of disability.

<u>e.g.</u>, Tr. 1380, 1430.  On October 26, 2010, Perryman, through her counsel, asked her physician, Dr. Manuel Pinto, to find that she was able to work in a sedentary position, based on her physical impairments, as Perryman had the opportunity to be hired in a sedentary position.  Tr. 1397.  There was no request for any limitations based on any mental or intellectual deficits.  <u>Id.</u>

The mental ailments addressed in the record during this time period related to chronic bipolar NOS, depressive disorder and epilepsy.  <u>See</u>, <u>e.g.</u>, Tr. 1360, 1362, 1375.  There was no mention by any providers that these conditions were not under control or that they limited Perryman in any manner.  The only reference for any sort of mental health treatment was on April 5, 2010, when Perryman requested a note from Dr. Jennifer Smith to support Perryman's request for a cat in her apartment as a therapy animal to improve her mood.  Tr. 1360-61.  At this appointment, Dr. Smith reported that Perryman did not appear to be in any apparent distress.  <u>Id.</u>  Dr. Smith indicated that Perryman was taking Neurontin that provided her a benefit from her epilepsy, and that while she had stress-related anxiety attacks, they were relieved with rest.  Tr. 1360.

In an initial visit questionnaire for the Twin Cities Spine Center dated March 4, 2010, Perryman stated that her physical or emotional problems only interfered slightly with normal social activities with family, friends, neighbors or groups.  Tr. 1427.  She also indicated that she had a learning disability, and she had to ask a lot of questions, all stemming from her accident when she was younger.  Tr. 1428.

### 3.   <u>State Agency Reviews</u>

On March 20, 2010, state agency psychologist Dr. James M. Alsdurf, Ph.D, LP conducted a psychiatric review technique for Perryman based on the available record from October 11, 2009 through March 10, 2010.  Tr. 353.  Dr. Alsdurf found no

medically determinable impairment, including no mental retardation under 12.05C of the Listings. Tr. 357. Dr. Alsdurf indicated that Perryman had no restrictions in her activities of daily living; social functioning; maintaining concentration, persistence or pace; and no episodes of decompensation. Tr. 363. In his notes, Dr. Alsdurf noted that while Perryman alleged a "'mental disorder,'" a bipolar disorder, anxiety, a learning disability and depression, the medical records did not reveal a history, diagnosis or treatment for any of these claimed ailments, despite her extensive treatment for orthopedic and pain issues. Tr. 365. As for Perryman's alleged difficulties with concentration, Dr. Alsdurf found that she was able to complete her function report independently and was able to break out each specific issue as her to alleged limitations so she could explain the impact of her injury to her liking. Id. Dr. Alsdurf also took issue with Perryman's claimed learning issues, given that she was able to communicate with her relatives on the computer daily using Facebook and Skype, which required more than cursory knowledge of the computer. Id. In addition, Dr. Alsdurf pointed to the fact that Perryman got along with her husband, two close friends and the exchange student who lived with her, and that her husband reported that she gets along well with authority figures. Id.

On May 19, 2010, Perryman underwent a psychological evaluation by psychologist Dr. McGinnis-Borg. Tr. 377. Perryman indicated that she had difficulty learning due to a traumatic brain injury she sustained in an automobile accident when she was three years old. Id. Perryman claimed to have trouble writing and difficulty with math. Id. Perryman also believed she had an expressive language disorder, although Dr. McGinnis-Borg noted that such a disorder was not observed during the interview. Id. Perryman stated that she received special education classes for math,

social studies, English and science while in school.  Id.  Perryman described her mood as being variable, with crying spells two times per week.  Id.  She also reported that she suffered from insomnia and sleep disruption, and had difficulties with attention, concentration and learning.  Id.  Perryman reported two psychiatric hospitalizations in 1981, a hospitalization in 1986 due to too much stress and pain on her left side, and a hospitalization in 1994 due to a mental breakdown. Id.  According to Perryman, she had been in psychotherapy in the past, but had not been in treatment for several years.  Id.  The documentation forwarded by the social security administration contained no psychiatric records.  Id.

Perryman reported her interests included listening to music, watching television and working in her garden.  Id.  Her typical day involved getting up, watching television, talking with her children on the computer and visiting with the foreign exchange student who lived with her; showering and taking care of her grooming; cleaning her apartment and talking to her daughter on the computer; going outside to visit with her neighbor; having lunch; watching television; visiting with her husband and foreign exchange student; making the evening meal; doing the dishes with the foreign exchange student; going for a drive or watching television with her husband; talking with her foreign exchange student; and then going to bed for the night.  Tr. 378.  Perryman shared the household chores with the foreign exchange student; did the laundry with help in lifting from her husband; did the shopping with her husband; and her husband handled the finances.  Id.  Perryman denied any difficulty with concentration; she stated that she would get distracted easily, but was able to persist on tasks completion; she believed that her pace was slower than most people her age; she related well with her family and friends; she got along with her co-workers, but seemed to get along better with younger

co-workers; and she denied difficulty getting along with authority figures, but admitted to being afraid of them.  Id.

Dr. McGinnis-Borg's mental status examination of Perryman showed that her grooming and hygiene were well cared for; she maintained good eye contact; she was pleasant and cooperative; her psychomotor activity appeared normal; her speech was normal; her stream of consciousness was somewhat circumstantial and she was very difficult to redirect, becoming irritable when redirected; there were no signs of suicidal ideation, hallucination or other obsessive thinking; her mood was normal and her affect was appropriate and full; she had good contact with reality and was oriented x3; she performed subtraction by counting on her hands, which still resulted in multiple errors; she could only perform very basic and simple mathematical operations; her general fund of knowledge appeared limited; she stated that she was not aware of any major current events; her abstractive capacity appeared impaired; and was unable guess at even simple and familiar proverbs.  Tr. 379.

Perryman was administered the Wechler Adult Intelligence Scale Fourth Edition (WAIS-IV).  Id.  Perryman achieved a full sale IQ score of 71, placing her within the borderline range of capability; a verbal comprehension score of 68, which fell in the within the mild range of cognitive impairment; and a working memory score of 66, which fell in the mild range of cognitive impairment.  Id.

Dr. McGinnis-Borg's assessment for Perryman was as follows:

| | |
|---|---|
| Axis I: | 294.9 Cognitive Disorder, NOS, likely due to traumatic brain injury |
| Axis II: | V62.89 Borderline Intellectual Functioning |
| Axis III | History of traumatic brain injury |
| Axis IV | No stressors noted |

Axis V          Current GAF =70[4]
                Highest GAF this year =70

Id.

Dr. McGinnis-Borg believed that Perryman may have difficulty handling funds in her own best interests due to cognitive limitations.  Id.  Dr. McGinnis-Borg opined that Perryman may have some difficulty understanding, remembering and following instructions unless they are very basic simple and written down for her.  Id.  Dr. McGinnis-Borg also found that Perryman would be able to sustain attention and concentration to task, carry out work-like tasks with reasonable persistence and pace, and tolerate the stress and pressure typically found in an entry level position, to the extent that the work tasks were within her cognitive ability to be able to perform.  Id.  Dr. McGinnis-Borg concluded that Perryman would be able respond appropriately to brief and superficial contact with coworkers and supervisors so long as the tasks were within her cognitive abilities and her coworkers and supervisors understood and made allowances for her cognitive limitations.  Id.

On July 2, 2010, state agency psychologist Dr. Alsdurf conducted a second psychiatric review technique form for Perryman based on the available records from October 11, 2009 through June 3, 2010.  Tr. 389.  Under Listing 12.02, organic mental disorders, Dr. Alsdurf found that Perryman had a cognitive disorder NOS and a traumatic brain injury.  Tr. 390.  In addition, Dr. Alsdurf found under listing 12.04, Affective Disorders, a major depressive disorder, recurrent, in full remission and under

---

[4]     According to the Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. Text Revision 2000) ("DSM-IV"), Global Assessment of Functioning ("GAF") scores of 61 to 70 reflect "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." This Court notes that the 2013 DSM-V has dropped the use of the GAF.  Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed. 2013).

control. Tr. 392. Dr. Alsdurf did not conclude that Perryman met the listing under 12.05 (Mental Retardation). Tr. 393.

As it related to impairments pertaining to Listings 12.02 and 12.04, Dr. Alsdurf found moderate limitations in Perryman's activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. Tr. 399. In making these findings, Dr. Alsdurf noted a diagnosis of major depression, recurrent and in full remission, well controlled, and a cognitive disorder NOS with a likely traumatic brain injury. Tr. 401. Dr. Alsdurf relied on a note from a treating provider, dated May 12, 2006, that Perryman suffered a cerebrovascular accident at age three and suffered from depression for a year that was relieved by neurontin. Id. In addition, Dr. Alsdurf relied on Dr. McGinnis-Borg's consultative examination. Id. In particular, Dr. Alsdurf noted that while Perryman claimed that she suffered from an expressive language disorder, Dr. McGinnis-Borg found that Perryman had no such problem expressing herself during the interview. Id. Dr. Alsdurf summarized Dr. McGinnis-Borg's findings that Perryman complained of sleep disturbances, low energy and difficulty concentration, but displayed no anhedonia;[5] she described frequent socialization and shared the responsibility for cooking, laundry and shopping; she showed good grooming and hygiene, and good eye contact; she was pleasant and cooperative; she had normal psychomotor activity, normal speech, no psychotic symptoms, and an appropriate affect; she was defensive and irritable when redirected; she had errors when performing mathematical problems, but was able to perform simple calculations; she was unaware of current events; she failed to guess at proverb interpretation; she had a full-scale IQ of 71 with a range of 66-

---

[5] "Anhedonia" refers to a lack of interest or pleasure from the performance of activities that would ordinarily be pleasurable. Stedman's Medical Dictionary, Anhedonia (27th Ed.2000).

86; and a GAF of 70.  Id.  Dr. Alsdruf opined that the record indicated an ability to tolerate stress in an entry-level position, as well as the ability to follow simple instructions with adequate concentration, persistence and pace in the context of brief and superficial social interaction.  Id.  Dr. Alsdurf also relied on Perryman's activities of daily activity including helping with cooking, household chores and shopping; driving and going out alone; stating that she does not go out anywhere without her husband; and socializing for hours daily.  Id.

As to Perryman's mental RFC, in the area of understanding and memory, Dr. Alsdurf found that Perryman was not limited as to her ability to remember locations and work-like procedures; was moderately limited in the ability to understand and remember very short and simple instructions; and was markedly limited in her ability to understand and remember detailed instructions.  Tr. 403.  In the area of sustained concentration and persistence, Dr. Alsdurf found that Perryman was not significantly limited in her ability the maintain attention for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, make simple work-related decisions, and complete a normal work day and week without any interruptions.  Tr. 403-04.  Dr. Alsdurf indicated that Perryman had a moderate limitation in the ability to carry out short and simple instructions and in her ability to work with others without being distracted; and a marked limitation in the area of being able to carry out detailed instructions.  Tr. 403.  In the area of social interaction, Dr. Alsdurf found no limitation as to Perryman's ability to ask simple questions or for assistance and her ability to maintain socially appropriate behavior; and a moderate limitation in her ability to interact appropriately with the public, to accept instructions and respond appropriately to supervisors, and to get along with co-workers and supervisors

without distracting them or exhibiting behavioral extremes. Tr. 404. Dr. Alsdurf found no limitation in Perryman's ability to adapt, except for a moderate imitation in Perryman's ability to respond appropriately to changes in the work setting. Id.

The mental RFC assigned for Perryman by Dr. Alsdurf was as follows:

> The claimant retains the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions.
>
> The claimant's ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive, or three and four step tasks, but moderately impaired for detailed and markedly impaired for complex tasks.
>
> The claimant's ability to interact and get along with co-workers and the public would be moderately impaired, but adequate for brief and superficial contact.
>
> The claimant's ability to accept supervision would be moderately impaired, but adequate to cope with ordinary levels of supervision found in a customary work setting.
>
> The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and four step work setting.
>
> Appears that statements regarding psych limitations are partially credible as MSE indicates greater retention of function than is suggested by claimant's allegations. MSS from 5/19/10 CE suggests ability to tolerate the stress of entry-level work sa [sic] well as ability to understand, remember, and follow simple instructions with adequate concentration, persistence, and pace in the context of brief and superficial social interaction. The assigned MRFC is consistent w/ the MSS in file. Please see PRTF for additional summary information.

Tr. 405.

D.    **Hearing Before The Administrative Law Judge**

Perryman appeared at a hearing before the ALJ on August 24, 2011.  Tr. 32-62.
Perryman testified that it was difficult for her to work because of her "back issue."  Tr.
37.  In addition, Perryman claimed another problem that caused her difficulty in working
was that she is a "learning disabled person," resulting from being hit by a truck when
she was three.  Tr. 43.  In particular, she claimed she has an expressive language
disorder and that she had been in special classrooms at school. Tr. 43-44.  Perryman
stated that she had suffered from seizures in the past, but that she no longer took
medications for the seizures and was seizure-free.  Tr. 44.

Perryman indicated that she could drive a car by herself.  Tr. 42.  With regard to
becoming a certified nursing assistant, Perryman testified that she successfully
completed the needed classes, but had her tests read to her.  Tr. 45.  In her position as
a certified nursing assistant, Perryman provided direct patient care.  Tr. 48-49.

Perryman described her typical day as follows: she got up in the morning; went to
the bathroom; made coffee; tended her vegetable garden; talked to her daughter on the
computer; laid down and stretched her back; walked around; watched television; talked
with her husband when he returned home from work; made dinner; did the dishes with
her husband and watched television with him; and then went to bed.  Tr. 47.  She also
stated that she played games on her computer, including Bingo, and that her husband
assisted her in the gardening of their vegetable garden.  Tr. 48.

V.   **DISCUSSION**

A.    **The Parties' Arguments**

Perryman argued that the Commissioner's decision to not find her disabled under
Listing 12.05C was in error.  <u>See</u> Plaintiff's Memorandum in Support of Summary

Judgment, p. 1. Perryman relied on the factual findings of the ALJ's unfavorable decision, in conjunction with <u>Contreras v. Astrue</u>, Civil No. 08-1196 (DWK/JJK), 2009 WL 5352828 (D. Minn. Aug. 26, 2009), to demonstrate that she met or equaled Listing 12.05C. <u>Id.</u>, p. 2. Specifically, Perryman contended that as a matter of law, she met the first element of Listing 12.05C—deficits in adaptive functioning—as evidenced by the ALJ's finding that she had moderate limitations in activities of daily living, social functioning, and in the area of concentration, persistence or pace. <u>Id.</u>, p. 3.

As to the second element of Listing 12.05C–evidence of such a limitation in adaptive functioning manifesting itself before age 22–Perryman submitted that this element is undisputed in light of the record evidencing a traumatic brain injury at the age of 3, along with reports of epilepsy, panic attacks, the inability to function well socially and in school, and placement in special education. <u>Id.</u>

As to the third element of Listing 12.05C–a verbal, performance or full-scale IQ between 60-70–Perryman asserted that the ALJ erroneously focused on her full scale IQ of 71, instead of her verbal IQ of 68. <u>Id.</u>, pp. 3-4.

Finally, with regard to the fourth element of Listing 12.05C–the presence of another physical or mental impairment imposing an additional and significant work-related limitation–Perryman argued that her degenerative disc disease clearly constituted a physical impairment that meets this element. <u>Id.</u>, p. 4.

In support of its motion, the Commissioner agreed that the ALJ's findings as to Perryman's IQ score and her physical limitations satisfied the third and fourth elements of Listing 12.05C. <u>See</u> Def. Mem., p. 13. As such, the Commissioner maintained that only issue before the Court was whether Perryman had carried her burden of establishing that she met the diagnostic criteria for mental retardation—"<u>i.e.,</u> that she

'has deficits in adaptive functioning that initially manifested [before age 22].'" <u>Id.</u> (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05).

The Commissioner took issue with Perryman's reliance on <u>Contreras</u> for the proposition that the ALJ's factual findings under the paragraph B criteria that Perryman had moderate limitations in the areas of activities of daily living, social functioning, and in concentration, persistence or pace, compelled a finding that Listing 12.05C has been met. <u>Id.</u>, pp. 13-14. First, the Commissioner claimed that <u>Contreras</u> does not stand for the proposition that a finding of a mild or moderate deficit in the paragraph B criteria establishes the first element of Listing 12.05C. <u>Id.</u>, p. 14. To the contrary, the language of decision indicated that the court was not taking a definitive stand as to whether a paragraph B designation automatically satisfied the diagnostic criteria of 12.05C. <u>Id.</u> Rather, the court explicitly stated that the "the overwhelming evidence in the record showed that Plaintiff does suffer from several deficits in several kinds of adaptive functioning."[6] <u>Id.</u>, p. 14 (quoting <u>Contreras</u>, 2009 WL 5352828 at *10). In contrast, the Commissioner argued that Perryman was able to independently manage her grooming, share in household duties, cook, garden, help in the care of two household cats, count change and handle bank accounts, communicate frequently with her children over the

---

[6]     As discussed by the Commissioner, (Def. Mem., pp. 15-16), in <u>Contreras</u> the court indicated that the plaintiff's house had been condemned due to such gross unsanitary conditions that child protection had found it unfit for his children to reside there; the plaintiff could not manage his finances; the plaintiff and his family exuded malodorous smells; the plaintiff could not read and his speech was very hard to understand; a psychological examiner found the plaintiff unable to pay his bills, go shopping or otherwise function independently and limited in terms of friendship, and diagnosed the plaintiff with borderline mental retardation; another psychologist determined that the plaintiff suffered from fetal alcohol syndrome, displayed limited language expression, and comprehension skills, and had additional deficits in the areas of social relationships, self-care, domestic skills, time and punctuality, work habits, pre-vocational skills, and getting around the home and in the community. <u>Contreras</u>, 2009 WL 5352828 at *7-9, 11 n. 8.

telephone and on the computer, use the computer to play games, and train to become and work as a certified nursing assistant for many years.  Id., p. 16.  Further, unlike the plaintiff in Contreras, Perryman was never diagnosed with mental retardation following her consultative psychological evaluation.  Id., p. 17.

Second, the Commissioner asserted that any suggestion that an ALJ's paragraph B labels automatically satisfied the requirements of Listing 12.05C, is inconsistent with the approach followed by the Commissioner and adopted by the Eighth Circuit.  Id. Under the Commissioner's own guidance and the cases of this circuit, the Commissioner maintained that a claimant's deficits in adaptive functioning must be "significant" to meet the first element of Listing 12.05C.  Id.

In support, the Commissioner explained that the definition of mental retardation used in the Listings is "consistent with, if not identical to, the definitions of [mental retardation] used by leading professional organizations," including the American Psychiatric Association ("APA"), which publishes DSM, the American Association on Intellectual and Development Disabilities ("AAIDD"), and the American Psychological Association.  Id., p. 18 (quoting Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018–01, 20022 (Apr. 24, 2002)) -- all of which require "significant" deficits in adaptive functioning.  Id., pp. 18-19.  Similarly, the Eighth Circuit requires "significant" adaptive limitations in order to meet Listing 12.05,[7] shuns any reliance on broad labels used by the ALJ uses in describing a claimant's paragraph B limitations, and instead looks to such factors as the claimant's education, work history, ability to communicate, success in social relationships, self-sufficiency,

_____

[7]    In addition, the Commissioner relied on several cases from other circuits rejecting arguments from claimants that paragraph B findings compelled a determination that a claimant meets the adaptive functioning requirement of Listing 12.05.  Id., pp. 21-22 (citations omitted).

any physical problems and limitations in concentration persistence and pace.  Id., pp. 19-20 (citing Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004); Cox v. Astrue, 495 F.3d 614, 618 (8th Cir. 2007); Miles v. Barnhart, 374 F.3d 694, 698-99 (8th Cir. 2004); Cheatum v. Astrue, 388 F. App'x 574, 576-77 (8th Cir. 2010)).

Applying these principles, the Commissioner contended that the ALJ properly concluded that Perryman did not meet Listing 12.05C based on her performance of semi-skilled work for many years, and her ability to care for herself and perform household chores, care for pets, handle money, and use a computer to interact with her children and play games.  Id., p. 20.  As for Perryman's testimony that she was placed in special classrooms in school, the Commissioner maintained this evidence did not require a finding of a deficit in adaptive function because it was not clear whether a professional recommended this placement and it appeared as though she was good student.  Id., p. 21 (citing Cheatum, 388 F. App'x at 576; Harris v. Comm'r of Soc. Sec., 330 F. App'x 813, 815 (11th Cir. 2000)).

Finally, the Commissioner explained that there was no inconsistency between the ALJ's assessment of moderate difficulties in the areas of activities of daily living, social functioning, and in concentration, persistence or pace, and the ALJ's analysis of Listing 12.05C, given that she cited substantially the same evidence to support her paragraph B findings and her conclusion that Perryman did not demonstrate deficits in adaptive functioning commensurate with her IQ score.  Id., p. 23.

## B. Analysis

SSA regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Such

conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1.  If a "claimant has an impairment that meets the medical criteria of a listed impairment, the claimant is presumptively disabled, and no further inquiry is necessary." Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003).

A "listed impairment" described at Listing 12.05C requires: (1) the claimant must satisfy the "diagnostic description" set forth in the introductory paragraph of § 12.05; (2) the claimant must have "[a] valid verbal, performance, or full scale IQ of 60 through 70;" and (3) the claimant must have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C; see also Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) (finding that in order to meet Listing 12.05C "a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.").  In other words, "Listing 12.05C requires four elements: (1) deficits in adaptive functioning; (2) evidence of initial manifestation before age 22; (3) a valid verbal, performance or full-scale IQ score between 60 and 70; and (4) 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'"  Contreras, 2009 WL 5252828 at *6 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05).

As stated previously, the only elements in contention in this suit are is whether suffered Perryman suffered from deficits in adaptive functioning and whether those deficits initially manifested before she turned 22.

The first issue before the Court is Perryman's contention that because the ALJ found on the paragraph B criteria that she had moderate limitations in the areas of

activities of daily living, social functioning, and in concentration, persistence or pace for Listings 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorders), she met Listing 12.05's requirement that she suffered from deficits in adaptive functioning.[8]

In Contreras, the court stated:

> At the conclusion of the hearing, the ALJ found Plaintiff to be mildly impaired in Activities of Daily Living and moderately impaired in Social Functioning and Concentration, Persistence, and Pace. (Id.) These areas are practically synonymous with the components of adaptive functioning that are associated with Listing 12.05C. Listing 12.05C does not require "marked" limitation in adaptive functioning, which would make it redundant with Listing 12.05D. Therefore, even accepting that the ALJ's findings of mild to moderate deficits in adaptive functioning is enough to satisfy the first element of Listing 12.05C, the overwhelming evidence in the record goes to show that Plaintiff does in fact suffer from deficits in several kinds of adaptive functioning.[9] Therefore, Plaintiff meets the first criterion for Listing 12.05C.

2009 WL 5252828 at *10 (internal citation omitted) (emphasis added).

---

[8] Listing 12.02 for organic mental disorders provides that a claimant must show "a loss of specific cognitive abilities or affective changes and the medically documented persistence" and Listing 12.04 requires a medically documented persistence of a depressive syndrome, manic syndrome or bipolar syndrome. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02A, 12.04A. However, meeting the requirements of paragraph A of Listings 12.02 and 12.04 is not sufficient to be found disabled under those listings. A claimant must also meet the paragraph B criteria of these Listings, which require marked restrictions in two following categories: activities of daily living, social functioning, and in concentration, persistence or pace, or evidence of repeated episodes of decompensation. Id., §§ 12.02B, 12.04B. Unlike Listings 12.02 and 12.04, Listing 12.05C does not require a finding of marked limitations in these categories. Indeed, the Listing 12.05C, Listing12.05D, allows a finding of disability if there is a "valid verbal, performance, or full scale IQ of 60 through 70" and marked restrictions in two following categories: activities of daily living, social functioning, and in concentration, persistence or pace, or evidence of repeated episodes of decompensation. Id., § 12.05D.

[9] To support her claim that a determination of moderate limitations on the paragraph B criteria mandated a finding that Perryman met the element of deficits in adaptive functioning for Listing 12.05C, plaintiff's counsel deleted the highlighted language from the Contreras decision from her brief. See Pl.'s Mem., p. 3. This omission was very misleading to the Court. In the future, plaintiff's counsel would be well advised not to engage in such editing.

As a preliminary matter, the Court rejects Perryman's argument that the Contreras court relied solely on the ALJ's determination that the plaintiff was mildly or moderately impaired on the paragraph B criteria to find that the plaintiff satisfied the deficits in adaptive functioning element of Listing 12.05. To the contrary, the Contreras court discussed and relied extensively upon the record regarding how the plaintiff lived and functioned and how the "overwhelming evidence" showed that he suffered from deficits in several kinds of adaptive functioning. Id. at *7-10; see also n. 6, supra.

Rather, as required by the Eighth Circuit, this Court will examine the record as whole to determine whether Perryman is suffering from "significant limitations in adaptive functioning" in order to meet Listing 12.05C,. See Johnson, 390 F.3d at 1071 (emphasis added).

While the SSA has not defined "deficits in adaptive functioning," it has stated that the definition of mental retardation used in the Listings "is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations [that deal with mental retardation]." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018–01, 20022 (Apr. 24, 2002); see also Durden v. Astrue, 586 F. Supp.2d 828, 834 (S.D. Tex. 2008) (finding that because "the SSA declined to adopt any one of [these] specific definitions, . . . the introductory paragraph of Listing 12.05 can be met if the individual is found to have, inter alia, deficits in adaptive functioning as defined by any of the four professional organizations.").[10] That said, neither the Eighth Circuit nor any other circuit has

_____

[10] By way of example, The DSM-V has defined deficits in adaptive function as follows:

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal

required that an ALJ use a specific measurement method adopted by any professional organization to determine if a claimant has deficits in adaptive functioning. See Charette v. Astrue, 508 F. App'x. 551, 553 (7th Cir. 2013). Indeed, the SSA has clarified that the definition of mental retardation "used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one

------

> independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The conceptual (academic) domain involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The social domain involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The practical domain involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.
>
> * * *
>
> Criterion B is met when at least one domain of adaptive functioning—conceptual, social or practical—is sufficiently impaired that ongoing support is needed in order for the person to work adequately in one or more life settings in school, at work, at home, or in the community."

 DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 16 (5th ed. 2013) 37-38 (emphasis added); see also Atkins v. Virginia, 536 U.S. 304, 309 n. 3 (2002) (quoting Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992)) ("The American Association on Mental Retardation (AAMR) defines mental retardation as follows: 'Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.'").

professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing use of any of the measurements methods recognized and endorsed by the professional organizations." 67 Fed.Reg. 20018–01, 20022 (Apr. 24, 2002); <u>see also Norwood v. Astrue</u>, NO. 3:12CV66 HTW-LRA, 2013 WL 959937, *4 (S.D. Miss. Feb. 22, 2013) ("The plain language of the revision is clear. The Listing for mental retardation sufficiently establishes the necessary elements for measuring adaptive functioning. While ALJ's are 'allowed' to use any of the methodologies endorsed by a professional organization, he or she is not required to do so.") Consequently, other circuits examining this issue and addressing the standards of the various professional organizations, have found that adaptive functioning refers to an individual's "ability to cope with the challenges of ordinary everyday life." <u>See</u> <u>Talavera v. Astrue</u>, 697 F.3d 145, 148 (2nd Cir. 2012); <u>Novy v. Astrue</u>, 497 F.3d 708, 710 (7th Cir. 2007) ("The key term in the introductory paragraph of section 12.05 of the regulation, so far as bears on this case, is 'deficits in adaptive functioning.' The term denotes inability to cope with the challenges of ordinary everyday life. If you cannot cope with those challenges, you are not going to be able to hold down a full-time job) (citation omitted); <u>see</u> <u>generally</u>, 20 CFR Pt. 404, Subpt. P, App. 12.00C(1) ("Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. <u>In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which</u>

you are capable of initiating and participating in activities independent of supervision or direction.") (emphasis added).  These definitions are supported by the DSM-V, which states that a deficit in adaptive function can be demonstrated by an inability to function in a life setting without ongoing support.  Thus, the Court examined the overall record to determine whether Perryman has significant limitations in her ability to cope with the challenges of ordinary everyday life, and concluded that she did not.

The record demonstrates that Perryman has the requisite ability to properly take care of herself, including maintaining hygiene, grooming, and being able to feeding herself.  Tr. 200, 202, 378.  In addition, subject to her physical limitations (i.e., pain), the record shows that Perryman has the ability to cook for her family, take care of two cats, garden, do laundry, and clean the house.  Tr. 200-02, 377-78.  While Perryman did not pay bills, which she attributed to problems with math since she was child,[11] she was able to count change, manage bank accounts, and could obtain money orders.  Tr. 203, 217-18, 237, 245.  Perryman also had the ability to use a computer to play games, shop, and to communicate with her family members through Facebook and Skype, (Tr. 48, 200, 204, 238, 365), drive a car on her own, (Tr. 42, 237), and shop with her husband.  Id.

With regard to her ability to socialize with others, the record indicated that she got along well with her husband and the foreign exchange student that lived with them.  Tr. 200.  She spoke with her children daily.  Id.  Perryman represented that got along well with authority figures; her husband went so far as to assert that she got along "very well" with authority figures.  Tr. 240, 248, 378.  Although Perryman asserted that she did

---

[11]     The record suggested that Perryman's difficulty with paying bills stemmed from the fact that her husband used an online bill pay service, which confused Perryman.  Tr. 217-18.

not have many friends and kept to herself, (Tr. 205), Perryman's husband stated that she visited friends and neighbors on a daily basis. Tr. 246. Indeed, Perryman represented that she related well with her family and friends and got along with her co-workers (but seemed to get along better with younger co-workers). Tr. 378. In her initial visit questionnaire for the Twin Cities Spine Center dated March 4, 2010, Perryman reported that her physical or emotional problems only interfered slightly with normal social activities with family, friends, neighbors or groups. Tr. 1427.

Of particular significance is the fact that prior to the onset of disability, Perryman worked as a certified nursing assistant, a semi-skilled position, from 2001 through October 11, 2009. Tr. 190. In that position Perryman provided direct patient care. Tr. 48. In fact, on the alleged onset of disability, Perryman was working as a certified nursing assistant, when she was injured by straining her hip as the result of moving a patient in a wheelchair. Tr. 1272. There is nothing in the record indicating that she could not work in this position because of a lack of adaptive functioning. To the contrary, Perryman admitted that she has never let go from employment because of an inability to get along with others. Tr. 240. Although evidence of Perryman's "ability to perform gainful activity is not relevant if she otherwise meets the requirements of Listing 12.05[, it] is relevant, however, to whether she has shown the deficits in adaptive functioning necessary to meet that listing." Cheatum, 388 F. App'x at 577 n.3 (citing Maresh, 438 F.3d at 901).

It is true that Perryman reported that she needed reminders to take her medications and there were days that she forgot to take her medications, but the evidence also showed that she did not need reminders to take care of personal needs and grooming. Tr. 202, 236. Likewise, although Perryman needed to be reminded to

go places, she was able to address that need by writing notes to herself and through her husband's reminders.  Tr. 204.

Perryman claimed difficulty completing tasks because she could not remember what she had done or where she had left off on a task, her mind wandered, and she had difficulty understanding anything she would need to read or comprehending the news. Tr. 206.  Perryman's husband stated that she followed written instructions "fairly well," especially if they are set out step-by-step, but that she could not follow verbal instructions very well because she became confused quickly.  Tr. 219.  Consistent with her husband's statements, Perryman reported that she could understand written instructions after re-reading them and asking lots of questions, and she could understand spoken instructions if she asked questions regarding anything she did not understand.  Tr. 239.

Perryman's husband stated that she could pay attention for up to two hours.  Tr. 247.  In her state agency consultation with Dr. McGinnis-Borg, Perryman denied any difficulty with concentration and that while she would be distracted easily, she was able to persist on tasks to completion.  Tr. 377-78.

In summary, upon review of the record as a whole, this Court finds that Perryman does not have significant limitations in her ability to cope with the challenges of ordinary life commensurate with her verbal IQ.  Perryman has the ability to take of herself and her pets.  Subject to her physical limitations, she is able to do household work and tend a vegetable garden.  She is able to handle a savings and checking account, count change, and obtain money orders.  She communicates extensively with her family on a daily basis, even using the computer through Skype, and used the computer to play games and shop.  Perryman is also able to socialize on a daily basis with friends,

neighbors and the foreign exchange student who lived in her house. To the extent that Perryman has exhibited difficulty understanding others or instructions, the record demonstrates that she was able to remedy this situation by asking questions on her own accord. In addition, Perryman denied any difficulty with concentration and claimed she was able to persist on tasks to completion.

Lastly, this Court cannot conclude that Perryman suffered from significant deficits of adaptive functioning related to her ability to care for herself, socialize, use proper judgment, or otherwise deal with the challenges of ordinary living, when she had been working as a certified nursing assistant for so many years (2001 through October 11, 2009), was charged with the safety and well-being of others, and only left the position because of a physical ailment. See Cheatum, 388 Fed. App'x at 577-78 (claimant's employment in semi-skilled and skilled positions for many years does not support a finding that a claimant met Listing 12.05); see also Cox, 495 F.3d at 619 (upholding ALJ's determination that claimant's impairments did not meet listing for mental retardation based in part on her previous successful work at a semiskilled job as a certified nursing assistant for more than two years).[12]

---

[12] Perryman's application for and receipt of unemployment compensation benefits for periods during 2010 and 2011, which required her to represent that she was ready and able to work, also cuts against her assertion that she was disabled. See McDermott v. Astrue, Civ. No. 11-2409 (PJS/AJB), 2012 WL 3202946, *22 (D. Minn. June 13, 2012) (quoting Cox v. Apfel, 160 F .3d 1203, 1208 (8th Cir. 1998)) (citation omitted) ("Acceptance of unemployment benefits is facially inconsistent with claimed disability because it 'entails an assertion of the ability to work,' but alone is not conclusive to negate a claim of disability.").

For all of these reasons, the Court concludes that substantial evidence in the record as a whole supports the ALJ's determination that Perryman did not meet or equal Listing 12.05.[13]

## VI.    RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 12] be **DENIED**; and

2.    Defendant's Motion for Summary Judgment [Docket No. 20] be **GRANTED**.

Dated:        July 23, 2013

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D. Minn. L.R. 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 6, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

---

[13]    Given that the Court has found that the ALJ did not error in finding that Perryman did not have deficits in adaptive functioning, it does not reach the issue of whether such deficits manifested themselves prior to when Perryman turned 22.